Water? I'm sorry. Thumbs up. Thank you. Thumbs up. Thank you. Let everybody get settled, Mr. Rubin. Okay, Mr. Rubin, when you're ready. Thank you, Your Honor. May it please the Court. This case involves primarily a legal question of contract interpretation. Is there any ambiguity in a 1923 sale between the Levy family and the T&P Railroad about whether the three crossings that are shown in the sale and which are discussed in the blueprint and shown in the blueprint are pre-deal servitudes that Franks can enforce or are personal servitudes that UP can cancel at its whim? Now, if there's any ambiguity at all, whether they are pre-deal or personal, then summary judgment was inappropriate, as we believe it was. The controlling case in this circuit is Total, decided last year, involving Louisiana law, oil and gas provisions, but involving property issues. And this Court reversed the summary judgment that a trial court had found a contract to be unambiguous. It was a two-page contract in this case. Here we have a one-page contract. And in Total, Judge Dennis, writing for the majority, held that when there was more than one reasonable interpretation of a contract, then it's ambiguous as a matter of law, and summary judgment's inappropriate. And as Franks has pointed out, there are not two reasonable interpretations. There are three here. And the first is that the crossing is a pre-deal servitude. Indeed, look at the plat. We have attached the big plat and the big charts in the thing, its exhibit. Number 8 is the blueprint. And it shows road crossing. It doesn't show crossing. It doesn't show access. It shows road crossing written in black, and that black was on the original. So there are three possible interpretations. One is that the crossing is a pre-deal servitude. Two, that the fencing requirement requires a different contractual interpretation, is not a servitude at all. And the third, the most strained, is that the addition of the words, successors and assigns, to a drainage provision separately, in the same sentence, but separately set apart with different adjectives and different vowels and different verbs, somehow changes the crossing servitude into personal servitude. Now, remember, this 23 sale had a blueprint. It would seem strange that the parties intending only a personal servitude would, in fact, take the time to put it on a blueprint and then label it a road crossing. Now, the Civil Code mandates that pre-deal servitudes are favored. And Louisiana courts have held time and time again, you don't need successors and assigns language to create a pre-deal servitude. Indeed, the lead case is Burgess. That's the case that the trial court discussed and distinguished. That's the way to clearly establish one, though, isn't it, put that language in there. It is, but Burgess actually was one where it got dropped out. In Burgess, Your Honor, they had it in the contract between the parties, but when they got ready to record it in the public records, the successors and assigns language got dropped out. So third parties reading that document in Burgess couldn't see successors and assigns, nonetheless held pre-deal why it is favored. McClure. But if you just had that clause alone, I mean, courts would probably interpret it as a pre-deal servitude, but it wouldn't necessarily be one without the magic language in it, would it? I disagree, Your Honor. I think it is presumed to be a pre-deal servitude for two reasons. Number one, you'd never need the magic language, otherwise it wouldn't be presumed. Number two, remember in 1923 when this was done, we still had the 1870 Code. The 1870 Codes had a provision for rural pre-deal servitudes, and I'll put that in my brief. That was my original brief. And it said the principal pre-deal rural servitude is the crossing servitude. So I don't think that there's any case that holds that you should put it in. And there are lots of cases that hold that if it's left out, it's perfectly okay and it's a pre-deal servitude, Your Honor. Well, even though it's presumed to be a pre-deal servitude, if you have language otherwise in the contract that would detract from that, you would consider that, wouldn't you? I mean, you have to consider all the language in the entire contract. Well, you have to go more than that, Your Honor. In fact, what Total said is you have to look at the conduct of the parties before and after the formation and of contracts of a like nature. So let's consider what the other contracts were. We have one here. It's the 1902 contract. Same parties, T&P Railroad and Levy Family. You can see the tracks that are moved. It's on the Raleigh Platte. That's the big one. That's the one in color. It's called Raleigh Platte-like Railroad, but it's R-A-L-E-Y. What happens in the 1902 servitude? The 1902 servitude doesn't say anything other than necessary crossings and drainage. All right? Now, under the rationale of the trial court and under Louisiana law, that would clearly be a pre-deal servitude, and yet somehow without the language of successors and assigns in 1923, it becomes a personal servitude. So the two are inconsistent, and indeed you note that UP tries to avoid discussing the 1902 documents. They say you don't need to look there. But, in fact, total mandates that you do. Didn't the later contract succeed, the old one contract? Actually, there's no direct evidence as to the reason for it, but the Raleigh Platte shows what happened was the Red River moved and the old tracks were underwater, so they had to move them. Now, we'll prove that at trial, but there's enough evidence in the record to show the basis for that. There's no explanation between 1902 and 1923 as to why they're doing it, but the Raleigh Platte shows it. What would a trial look like if we reverse and it goes to trial? I mean, there's no one to testify from the time this deed was enacted. What's going to come out at trial that's going to present a different record from which we have now? Well, good question, Your Honor. Several things. Number one, you had a historian to testify about the movement of the Red River, the need to move the railroad. Number two, farmers in the area at the time who testified about the use of crossings over the railroad and the use of it for the period of time. Number three, abstractors to prove similar language in other contracts at the time around not merely this railroad but around the area, because, remember, custom and usage becomes an issue. That's the Henry case. So I think there's lots of evidence that can be put on at trial about that. In one of his earlier opinions, Judge Stagg said the railroad, the evidence showed the railroad permitted these people to make the crossings. Was there really any evidence of that in the previous cases? Well, that case is not before you. There was a possessory action about who possessed it or not. But I will tell you that this Court's opinion in Frank's case talked about approach by a dirt road and years of uninterrupted usage. So there is lots of evidence that that crossing had been used. They're going to say, well, it doesn't prove who used it. The point is there is evidence that it was used and that the crossings were done. Indeed, in 1923, how did you approach things? There weren't tractors then. You were hauling things by cart. Henry, which this Court cited in total, Henry is a Louisiana Supreme Court opinion, Henry said that you determine the contracting parties by looking at the practical and economic realities of the time. And Judge Costa, that goes to your question. We're able to put on evidence of what happened at the time through historians and we're able to put on evidence at the trial of similar contracts and show not merely from reported cases, which I picked up in my brief what the language was, but by looking at abstracts and putting that in the record, which you could not have taken judicial notice of. You can't take judicial notice of the stuff in the few cases I found. But there are lots of them out there, and that's the evidence we would put on at trial. What meaning do you give to the successors and assigns language that modified the drainage provision? I think you say that that was meant to prevent the possibility of prescription. Why wouldn't that also apply, though, to the crossings? Okay, there are three reasons. That's a good question. The successors and assigns language, Your Honor, doesn't add clarity. It adds ambiguity, and here's why. Number one, drainage is always a pretty observative under Louisiana law. You don't need successors and assigns. It always is. But in 1923, as we showed in our brief, there was some real concern as to whether your rights of drainage could be lost. There was some uncertainty in the jurisprudence. So it was natural that you would put that there. In addition, there was flux in the cases, and we showed it in our brief, about what was a pre-deal in personal servitude in 1923, and there was lots of litigation about fencing, including railroads' obligations to fence and statutes that said they didn't have to and what happened if cattle got killed. So what I think the parties were doing, although there's no evidence of this, and I think we're going to talk about that at the trial, what I think they were doing was they were trying to use a belt-and-suspenders approach. This is drainage, and by the way, because of this case law out there, it ain't ending. But what it doesn't do is it certainly doesn't add clarity to anything about fencing, and it doesn't add clarity to anything about crossings. It doesn't by its nature change that. And if you said it did, then you'd have to say that the 1902 servitude was pre-deal, and that somehow the parties changed their mind and did it through this weird way of changing one clause in a sense that had nothing to do with the language specifically about crossings. So I think it increases ambiguity, not decreases it. You know, it just seems to me the way you read the clause would be as though it were written, it's understood and agreed that Texas and Pacific, comma, its successors and assigns shall, and then one, two, three. Now that's not what it says, Your Honor. Sorry? No, it doesn't say that, Your Honor. I know it doesn't. I say that's the way you read it. No, no, that's the way they want to read it. What I want to read is that you shall give a pre-deal servitude of crossing. You shall give a fencing thing, and you shall give a drainage obligation because what the court did, if successors and assigns modified or altered something, you would have thought they would have altered it earlier. Indeed, by the way, they read it the same way. They read it as ambiguous. Now, how do I know they read it as ambiguous? In total, Judge Dennis, your opinion, you said that the parties tacitly concede, the one who claimed it was unambiguous, tacitly concede they cannot completely rely upon the explicit words. Look at what they moved for in summary judgment. They said two things in summary judgment. They said, number one, they said, oh, this is a personal servitude, kick it out. And then they said, alternatively, by the way, if it's not a personal servitude, it's a pre-deal servitude, but let's limit it to agricultural purposes. In other words, in the same pleading, in their summary judgment, they said it's pre-deal and personal because they wanted to limit it to agricultural use. They conceded in that summary judgment that it was by nature ambiguous. Otherwise, it wouldn't have had the alternative forms of relief, one seeking a personal servitude and one seeking a pre-deal servitude. The key case is the Taylor case, the Louisiana case, that the district court would think erroneously distinguished and the UP wants to distinguish. Now, in Taylor, there was a pre-deal servitude involving fencing and draining and crossing, just like here. And the district court and the UP says, oh, no, no, it was a landlocked case, and they use it by selectively quoting language from the plaintiff's allegation. But the defense alleges it wasn't landlocked. If you read the case, the railroad says it wasn't landlocked. And the court doesn't go off on the landlocked articles. What do they do? They quote the lotched deed, L-O-T-H-T-E, deed, and they say the right followed the property and was not personal to the owner.  Because of the deed. The opinion below, Your Honor, cannot be squared with this court's ruling in total. If there is any ambiguity, if it can be read one way or another, then you must reverse for trial. It can't be squared with Taylor. It certainly can't be squared with Burgess. And let me ask you this. Yes, Your Honor. Mr. Rueb. To give any effect to the successors in assigned language, don't we have to consider the fact that it was left out in the crossing clause, yet included in the drainage clause? And there must be some reason for that. Well, Your Honor, if you say that that was the case, then you've got to go look at the 1902 Act. And if you conclude the 1902 Act, as I think you must, was a predial servitude, then there was no need to have it in the crossing clause in 1923. There was no need. There was no need to do that. What you can't do is pull this out and then say, but I'm going to ignore what happened in 1902. In 1902, there was no successor in assigned language. In 1923, in the crossing provision, there's no successor in assigned language. I think that's consistent. But what if you're saying if there's got to be a reason, you're saying it's ambiguous, which I think then mandates a reversal. Your Honor, I will hold the rest of my time. I have a question about – Oh, I'm sorry. This is a curiosity. When you had the separate possessory action went to this circuit twice, once in an en banc case, and it's been almost ten years of litigation, why are these crossings worth so much? I mean, obviously the fees that have gone into this litigation are pretty significant. Your Honor, it's outside the scope of the record, but clearly the parties, the railroad doesn't like them, and the landowners love them. And that's all that the record reflects. I could give you lots of things outside of the record, but I don't think that's appropriate for oral argument. Okay. Thank you, Mr. Ramey. Mr. Perez. Good morning, Your Honors. May it please the Court, Kathleen Perez on behalf of Union Pacific Railroad Company. I'd like to spend a minute summing up our version of the case and then touch on a few things that have been discussed this morning. It is the policy of this state that acts appearing to transfer a movable property be read and interpreted from the face of the instrument. That's pretty black letter law. Quoting from Beard v. Nunn, a 1931 Louisiana Supreme Court case, there would be no security whatsoever for purchasers of real estate if they were not entitled to rely on the title deeds to such property as being exactly what they purport to be. And in this case, all Union Pacific asks is that the court read the deed the same way the magistrate judge did, the same way Judge Stagg did, that the deed is what the deed is and the deed says what the deed says. And what does the deed say? It is understood and agreed that Texas and Pacific Railway shall fence said strip of ground and shall maintain said fence at its own expense and shall provide three crossings across said strip at points indicated on the blueprint and made part hereof, and that said Texas and Pacific Railway hereby binds itself, its successors, and its assigns to furnish proper drainage outlets across the land here and above conveyed. If I were to give this very small paragraph as part of a one-page contract to any English student, I believe that English student would come up with the same reading that Union Pacific has come up with. We do not believe that there is absolutely anything about this that's ambiguous, and that is why we filed a motion to dismiss right out of the bat in this case because the deed says what the deed says, and there is no need nor any right to look at anything else if the deed is clear, and it is. And so we presented that deed to the magistrate, and we said here's the deed, here's the law, here's the civil code, and here's how you interpret servitudes, here's how you interpret contracts in Louisiana. It's difficult for me to look at that deed and see that it's a personal servitude. You've got land here that's agricultural land, has been owned by this family. It's obvious that crossings were to favor the land, not named individuals. I would disagree. That would be my first impression reading it. So I don't understand why it's so unambiguous. Well, the district court went down that path and looked at all the cases and looked at the idea that a servitude in order to be pre-deal has to benefit the land. The district court said there are some cases that would argue in favor of the crossing being a pre-deal servitude. Correct. But I don't think that's a fair interpretation here because they said successors and assigns when they came to the drainage. Well, the district court noted the fact that in order to read this contract, the court had to both use contract principles and servitude principles, and you start with the plain meaning of the contract, and you give each word its generally prevailing meaning, and you try not to leave any surplusage. And what the court ended up saying is that all those cases were distinguishable. Franks did not set forth one case where one type of obligation was treated one way and another type of obligation in the same sentence was clearly treated another way. And what the court decided is that the party's intent, based on the words that they chose, including the fact that, you know, Mr. Levy here is an attorney and has served as an attorney for his family in this case, they knew what they meant. They said what they meant. To go and look to all of these other things, to look at the 1902 deed, to look at a 1913 road agreement with the parish that bears no connection to this case, to do any of those things goes beyond what this court is supposed to do in reading a contract on its face. Let me ask you this. You don't dispute, do you, that if you read the first two clauses, if that's all they had in that contract, you'd have a pre-deal servitude, wouldn't you? I believe that if you read the first two clauses and there is no express intent about pre-deal or not pre-deal, personal or not, that if you read those first two clauses, you would go to the Civil Code, and the Civil Code says that if there's a benefit to the land and it's not expressed in the contract, then you can presume that it's pre-deal. But it is expressed. We have an expressed contract here that you can't ignore. So, yes, could you argue that, absent this last clause, that it could be implied that it's pre-deal even though it does not say? It would be presumed, wouldn't it? Yes. Yes, the Code article says it is presumed, but you start with the idea of whether or not it's expressed in the contract, and here it's expressed in the contract. The thing about it is Franks wants you to think that pre-deal servitudes are every crossing that exists. Pre-deal servitudes are favored in the law. It couldn't be farther from the truth. It's not quite expressed enough to rule out the possibility that parties thought they were dealing with a pre-deal servitude with respect to the crossings. I would suggest that, at the very least, the railroad knew that it was not contracting for a pre-deal servitude because we have, in this case, something that we put in as part of our summary judgment, other railroad crossings in this area where the railroad specifically says. The railroad thought that. Wouldn't they have said this is a personal servitude in favor of Mr. Adolph Levy, Susie Q. Levy, and so on and so forth, and it shall end when these people die? Wouldn't the railroad have put that in if they really intended that these farmers were not going to be able to have these crossings for as long as they were tilling that soil or perhaps transferred it to somebody else who wanted to use it for that purpose? We suggest that this was a bargained-for contract. The Texas and Pacific paid five times more money for this contract than they paid in 1902. Some of the Levy's that were as part of this contract were living in another country. It's not clear to me from this contract that the Levy's needed these crossings or that they contracted for them. The contract language says what it says. Texas and Pacific agreed to build crossings, not Texas and Pacific and its successors and assigns. So taking it out of who is the obligee, who's going to get the crossings, but leaving it to who's going to provide them. Texas and Pacific is going to provide them. Texas and Pacific is going to provide fences. But Texas and Pacific and their successors and assigns are going to provide drainage. And it showed that these parties, in this case, in this one-page agreement, knew what it meant when they wrote these things. You know, you've got a Code Article 730 that says, doubt as to the existence, extent, or manner of exercise of a predeal servitude shall be resolved in favor of the serving of a state. So, I mean, are you backing away from the proposition that if you eliminate that third clause, you have a presumption of a predeal servitude? I believe that you start from the idea that servitudes are in derogation of public policy, that servitudes. What do you do with that Code Article? 730? Yeah. 730 says that if there's any doubt that this servitude exists, then it doesn't, that it cannot be interpreted that way. Where is that in the law, that servitudes are in derogation? If you look at Article... I saw that in your brief, but I didn't see any citations. Sure. Article 730 talks about, says, doubt as to the existence, extent, or manner of, or exercise of predeal servitude shall be resolved in favor of the serving of a state. If you go on to read the comments, and I am, I recognize that comments are not the law, but what the comments do is they set forth the law not only predating this current civil code, and not only predating the code of 1870, but, you know, the civil code, the original civil, civilian law. If you look, only because it's cited here, courts have repeatedly declared that servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law. That is Parrish v. Municipality from 1853. Further, servitudes claimed under titles, like here, can never be sustained by implication, and that's what's happening here. Franks wants to sustain these servitudes by implication, by what they believe people needed or wanted back then, but, oh, by the way, there's no evidence, and that's what Judge Stagg ultimately ruled. There's a whole lot of talk about all these different things that were going on. There were only two affidavits, and they were basically landmen who said, I went and gathered these documents. You know, we've heard a little bit this morning about what Franks might want to argue if they go to trial. Perhaps they could get other people to talk about crossings. They could have gotten those things in opposition to this motion for summary judgment. They didn't come up with a bunch of historians to say crossings were really important, this is for the land because of these really important reasons. If you look at the Burgos case that we kept talking about, the court found that it was for the land, that there was room for planting and growing vegetables. I don't recall exactly, but the idea being somebody put forth proof that there was a benefit to the land. And, of course, we can all sit here and presume that crossings are for the benefit of the land, but railroads enter into crossings all the time that are strictly personal. Just because it's a crossing, railroad or passage, does not mean that it's a pre-deal servitude. That's what the contract of the parties is for. And here, the contract of the parties says what it says, and we believe that it's not ambiguous. There is nothing ambiguous about what it says, and that's what Judge Stagg said. And, by the way, that's what Franks originally said. Franks, according to Judge Stagg, says this isn't ambiguous, but they still want us to look outside the contract. And the judge rejected that view, and we reject that view. And, you know, Franks has made a host of new arguments to this court, including some differences between the revised civil code and today's civil code and all of that. But when it comes down to it, you know, if we're going to talk about the Total case and what it meant about ambiguity, you know, contract ambiguity, it has to be ambiguous from its face, and there's nothing ambiguous here from its face. But further than that, Franks would have you believe that if it's ambiguous, summary judgment denied. However, if you look at civil law cases on servitudes, ambiguity, if you look at the Palamec case, Palamec v. Perdome, it says servitudes are so disfavored that in an ambiguous agreement, it is unenforceable. So here— No, I saw Louisiana cases that looked like they were really strained to find a pre or servitude from the language of the contract. Not presumed that it was not one. Sure. I mean, you know, it is—it's a balancing act. The code articles seem to go both ways. You've got 730 saying doubt is resolved against it, and then you also maybe say that it's presumed if there's a benefit to the land. But here, they didn't even argue a benefit to the land. There's certainly not any evidence to the benefit of the land. Maybe they can stand up here today and say how great crossings are and how important it was at the time. There is nothing in the record about that. You know, what we have, you know, is our agreement. And when you have the agreement and it's not ambiguous, then the doubt has to be resolved against restraining our property. You know, a crossing for a landowner to get to his land is not just as a matter of common sense a benefit to the landowner. If there were some evidence that this landowner were landlocked, that would be the case. He doesn't have to be landlocked. If he can cross to get to and from his land from various locations, why is that not a benefit to the landowner? I mean, I could see how you might think it was a benefit to the landowner, but at the same time, if it was so important to them, they could have put it in this contract. Is there some ancillary belief that it's good to be able to cross where you would like to cross? That's what this case is all about. Franks wants to cross. You know, they already have multiple public crossings from all different sides, but they want these crossings. So, yes, I would say that's a matter of convenience, which the code also says if it's simply a matter of convenience, then it's not a previous servitude. There's no evidence here that the Levees were landlocked. If they were, they could have moved under the code article related to landlocked properties, but they didn't. The landowner has to be landlocked before a crossing to get to his land. He benefits the landowner? If it's by contract, it must be express. And so if it's not express, only if it's not express would you go outside of the contract and then start to go towards these presumptions. I'd like to talk for one minute about the Taylor case that has been so talked about in the briefs and today. There's some discussion that, you know, pre-deal servitudes must be, or every passage must be pre-deal when it comes to a railroad. But that was a case where you were talking about expropriation, not even expropriation, St. Julian doctrine expropriation of property, and the later landowner wanted the crossings and wanted certain drainage rights. The court ended up holding that regardless of that particular contract, it was owed because it was of all right and equity, under the circumstances where you have a St. Julian taking, and like you said, somebody would like to be able to get to their property, and in that case it appeared that the property was landlocked. So, you know, we have a case here where there is no evidence that they were landlocked. The parties were sophisticated. Mr. Levy is an attorney. They knew how to contract. If contracting for drainage was so important to say that it went to their successors and assigns, then the same could be said for how, as Your Honor stated, they could have said Texas and Pacific and their successors and assigns will do all of these things. But they didn't choose that language. And so we're left here today, 90 years later, guessing about what these people meant. And that's the point. That's the problem, to sit here and guess about what the Levy's thought or what the Levy's believed when there are no Levy's around. Frank has admitted that there's no evidence about the intent of this contract. And just to talk for one minute about the 1902 contract, the 1902 contract was also between the Levy's and Texas and Pacific, but related to a different portion of property 20 years earlier. It's not the same contract. It's the same parties. It's not the same subject matter. But more than that, it's going outside of the document when the document's not ambiguous. As we've stated, there's nothing, you know, there's nothing hidden about what we believe. This contract is not ambiguous. We move for alternative relief related to restricting the use of the crossing because what was an agricultural crossing is now being used for oil and gas exploration, which creates a danger for Union Pacific, and that is why we move for alternative relief. But it has nothing to do with the fact that this contract, on its face, is not ambiguous. And moreover, Franks didn't even argue that it was below. And now they're coming with these three different interpretations. Those interpretations were not urged to judge TAG. Those interpretations were not urged to the magistrate. The magistrate ruled on the motion to dismiss. Judge TAG was kind enough to give Franks a second bite at the apple and let them come back and do discovery. We did all that, and discovery showed nothing. So then Judge TAG took a second look at it. We filed a motion for summary judgment on basically the same premises. Franks opposed the motion on the same premises. And then the judge ruled, same as the magistrate judge, that all the cases were distinguishable. All the cases where you presume pareidial servitudes are distinguishable because these parties chose this language. As I read Judge TAG's opinion, he said without that successors and assigns language in the third clause, the landowner would have established a pareidial servitude. You disagree with that, I take it. I disagree with the fact that it must be expressed on the language. I start with what the code says. It's got to be expressed in the language. You don't put much weight on the successors and assigns language. You just say they didn't create one to begin with. No, that's not true. I believe that there would be a better argument that the parties intended a pareidial servitude if it were silent. Because if it were silent, you could say it's not expressed one way or the other. So let me look further into the code articles that say if it's not expressed and there is a benefit for the land, then it's presumed to be pareidial. But here, because it is expressed, you just don't get that far. So both the magistrate judge and the district court judge said, okay, fine. If you stopped here, okay, I see where you're going with this, and it would be akin to these other cases where you find a pareidial servitude. But given the contract construction articles, you just can't get there. Because at the end of the day, to give meaning and right to this deed, which is filed in the registry of court in Caddo Parish since 1923, you've got to give meaning to what these parties, the language that they chose, so that the next person can come up and pick up that deed and know what it means. And I believe that the way we read it is the way that any regular person would read it. It takes a very tortured, distorted, roundabout way to sit there and say, well, if you presume a benefit for the land and then you do this and then you do that, and then you look at the 1902 deed, which, by the way, isn't that really clear anyway, then you throw all those things together and it must have been pareidial. In this case, Mr. Levy, a lawyer, and his entire family negotiated for the railroad for what was a pretty big sum for a railroad servitude at that time. At that time, railroad servitudes were often a dollar. This was $3,000, the equivalent of some $50,000 today or more. So they bargained for this. This was not an expropriation. It was not a case of the railroad coming in and making a taking. This was a bargain for agreement for a pretty substantial sum of money that these individuals came and this is what they agreed to. And so you can only presume that they meant what they said. And to go beyond what they meant what they said is to, you know, to cast aside our system of authentic acts, not only contracts being read on their face, but authentic acts, deeds that are filed and registered at the court so that there is some certainty all these years later about what those things mean. If there are no other questions. Okay, thank you very much. Okay, Mr. Rubin. My learned counsel wants you to ignore the 1902 deed and say it's just fluff. Well, look at the language of the 1902 deed. It says the railway company is to put in all necessary crossings and is not to obstruct drainage. Now what's the change between 1902 and 1913? 1923 says you shall provide three crossings, so we're more specific. And now it's not to obstruct drainage. You shall furnish proper drainage. So the clause about drainage actually changed. The crossings didn't. And she says, well, there's no evidence of the use of the parties. This is the map. I know you can't see it, Your Honors, but it's there in the record. I put it in the record excerpts in its full form. And if you'll look at it, you'll see it says road crossing in three places and it also says cane and it says corn. There's no question that this was agricultural use and the crossings were there. Indeed, that was the point of their summary judgment. She says, well, we moved an alternative. That's right. And when you move an alternative, you recognize the possibility that it could be a previous servitude. That's why they wanted to restrict it to agricultural use. So by their mere recognition of that in their summary judgment, they, in fact, proved the case. They also make a strange argument. They made it in footnote 110 of their brief, and they make it again here that, well, they got paid five times as much in 1923, so they got less than they had in 1902? That didn't make any sense to me, and it doesn't make any sense to me now. If 1902 is a previous servitude, which I think we have to concede it was, then somehow they bargained for less by getting five times as much money in 1923? That just doesn't make any sense at all. The Article 730, we've briefed it. I think the word existence, in fact, changes it, and we've commented on that. But in any event, in any event, there is ambiguity on the face of this document itself. And when the district court said that the Louisiana cases are less helpful than usual, it was simply a way to avoid it. Now, by the way, I want to answer one of the questions Judge Davis, you asked about crossings. As we said, the 1923 crossing was a mile long, over a mile long. There's a pretty good reason why people don't want to have to go out to that road to go back around to the other side of their property. The other thing you'd have to conclude is this. If the 1902 deed is, in fact, a previous servitude, which I think it is, and 1923 is a personal servitude, you'd have to conclude that the Levees changed their mind about the use of the property, which leads to ambiguity, which I can't think you would reach that conclusion. Your Honor, when it comes time to look at this contract, you cannot ignore Total. There is more than one reasonable interpretation. There is more than one way to read this contract. And you can't ignore a plaque that says road crossings, not just accidents. And you can't, by the way, ignore the 1913 deed. There's no evidence that these are different tracks of land, but even if there were, Total says it's the same contract, the same issues between the same parties. You can't ignore it. And the 1913 deed, although it doesn't involve the parties, does involve three crossings and drainage. 1913, they're concerned about three crossings. Over the railroad tracks, the 1913 dedication tracks along the railroad tracks. It says it's 100 feet from the center of the railroad tracks. So they're concerned about three crossings in 1913, they're concerned about crossings in 1902, and they're concerned about crossings in 1923, and somehow they've changed their mind that this becomes a personal servitude because they get paid five times as much. Your Honor, there is ambiguity here. Total is controlling. Taylor is controlling. The court decision below should be reversed, and we should go to a full trial. Thank you. Okay, thank you. Thank you, Counselor. We have your case.